FILED
United States Court of Appeals
Tenth Circuit

December 29, 2015

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

KELLY MAURICE HILL,

    Defendant - Appellant.

No. 15-5003
(D.C. Nos. 4:14-CV-00439-GKF-FHM and
4:10-CR-00165-GKF-1)
(N.D. Okla.)

_____

**ORDER DENYING CERTIFICATE OF APPEALABILITY**[*]
_____

Before **MATHESON**, **MURPHY**, and **PHILLIPS**, Circuit Judges.
_____

Kelly Hill, a federal prisoner proceeding pro se, seeks a certificate of appealability (COA) to appeal the district court's order denying his habeas corpus petition filed under 28 U.S.C. § 2255. For all reasons stated below, we deny a COA and dismiss this appeal.

**BACKGROUND**

**A. Events Leading to Guilty Plea**

On October 12, 2010, a grand jury in the Northern District of Oklahoma returned an indictment charging Hill with conspiracy to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(B)(vii). A few months

_____

[*] This order is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

before this, Hill—represented by retained counsel, Steven Scharg—began cooperating with the government, attending several debriefing sessions, and providing information.

On February 8, 2010, Hill and his counsel flew together from Michigan (where Hill lived) to Oklahoma for Hill to enter a guilty plea to the charges. Once there, Hill told his counsel that he no longer wished to plead guilty. Responding to the district court's questions, the prosecutor said that Hill had "basically entered into a verbal plea agreement, if you will, well over seven months ago" and referenced earlier debriefing sessions with Hill sometime before June 2010 through about December 14, 2010. R. vol. III at 6–7, 12. The government then told the court that on January 5, 2011, "one of the principal witnesses in my case was murdered in Detroit and another witness, deceased, wife was attempted murdered." R. vol. III at 7. He further advised the court that he "had another witness who was ambushed and by mistaken identity his father was grave – not gravely, but seriously injured." *Id.* In addition, the prosecutor told the court that he intended to supersede Hill's indictment to add defendants.

Having heard these responses to its questioning, the district court called counsel to the bench and asked Hill's counsel whether "given that there is no cooperation agreement here, is the concern of Mr. Hill that he might be perceived, if he does not go to trial, as having cooperated?" *Id.* at 8. Hill complains in his habeas proceedings about Scharg's response to the court's question. Scharg responded, "Your Honor, I think his position is he thinks that the government doesn't have enough witnesses to

2

proceed against him in trial at this point," continuing, "[a]nd he just thinks they can't prove his case being beyond a reasonable doubt." *Id.* at 8–9. The prosecutor then told the court that he had heard that "Hill's mother, who is also an unindicted coconspirator, found a shoe box on her car hood in Detroit with two dead rats in it with a note that allegedly said, 'Your son's next.'" *Id.* at 10. The prosecutor said that the two shootings had similarities, apparently both involving AK-47s. The prosecutor asked that Hill now be detained. The district court sent that question to the magistrate judge who had held the earlier detention hearing when Hill was cooperating.

On February 9, 2011, the magistrate judge issued a detention order detaining Hill until a further hearing could be held on February 15, 2011. In its order, the magistrate judge reviewed a number of matters brought to his attention. In particular, he noted that a husband and wife (Corry and LaTonya Thomas) charged in a case related to Hill's had agreed to testify against Hill regarding an attempted shooting at their home (with their two young children) where gunmen fired 19 rounds from an AK-47 into their master bedroom. Fortunately, no one was injured. A federal agent then flew to Detroit to meet with the couple, who agreed to go into custody and identified Hill as the person they believed responsible for the shooting. On January 5, 2011, before entering protective custody, the couple returned home for some belongings. Once there, two or three men firing guns (one apparently an AK-47) ambushed them. These gunmen killed the husband and wounded the wife's

3

mother, but the wife somehow escaped injury.[1] In addition, the magistrate judge noted that on January 11, 2011, the father of another witness in Hill's case (witness Joshua Wheeler) was ambushed with gunfire while driving his son's car. This left just one of the government's substantive witnesses against Hill untargeted for attack. Also, the magistrate judge noted that law-enforcement officers had detained Hill for several days after the attacks but later released him uncharged. Finally, the magistrate judge said that two confidential informants told the Drug Enforcement Agency (DEA) office in Detroit that they had heard that Hill had taken credit for the shootings. The federal prosecutor did not learn of Hill's alleged statements until February 7, 2011, and soon after filed the motion for detention.

## B. Hill Enters a Guilty Plea

By March 7, 2011, Hill had apparently rethought his decision not to plead guilty. On that day, he filed a "Petition to Enter Plea of Guilty and Order Entering Plea." In the petition, Hill wrote his factual basis as follows: "I, Kelly Hill, conspired with other[s] to distribute marijuana in the Detroit[,] Michigan area. I conspired with others to have marijuana transported from Phoenix[,] Arizona to Detroit, Michigan starting in Nov[.] 2008 through December 2009." R. vol. II at 64. In response to the petition form's bolded direction that he "[l]ist any and all advice or recommendations by your attorney upon which you rely in entering your plea of

---

[1] The husband and wife were the same people stopped on June 22, 2009 by the Oklahoma Highway Patrol, carrying 265 kilograms of marijuana back to Detroit. They immediately began cooperating with law enforcement. They had transported about 5 loads of marijuana for Hill. Hill put money on their credit cards or gave them cash for the trips.

4

guilty," Hill wrote, "I made my own decision to plead guilty." *Id.* The petition form contained sections captioned "Waiver of Constitutional Rights," and "Minimum Sentence and Mandatory Minimum Sentence," the second advising Hill that his offense was punishable for 5 to 40 years of imprisonment, a fine up to $2,000,000, and a term of supervised release of at least 4 years. In a "Sentencing" portion of the petition form, Hill wrote "None" in response to a direction to "[i]nsert any promises or concessions made to the defendant or to his/her attorney." *Id.* at 67. He further acknowledged knowing that "the sentence I will receive is solely a matter within the control of the Judge. I hope to receive lenience, but I am prepared to accept any punishment permitted by law which the Court sees fit to impose." *Id.*

As part of this same petition form, Scharg was also required to sign after agreeing (1) that Hill's declarations were accurate and true, (2) that he had advised Hill of the provisions of advisory guideline sentencing, (3) that Hill understood that the court could impose a non-guideline sentence, and (4) that in his opinion Hill would voluntarily and knowingly plead guilty. For a direction to identify any "predictions or promises to the defendant concerning any sentence the Court may award," Scharg wrote, "N/A." *Id.* at 68.

In his habeas petition, Hill relies heavily on the following notation on the bottom of the first page of the petition form: "57-71 Level 25." *Id.* at 63. It appears that the number originally was 28 and a 5 was inserted over the 8. From the petition itself, we are unable to tell who wrote that notation or when it was written.

5

Also on March 7, 2011, in tandem with the petition form, Hill pleaded guilty to the charged count of conspiracy to possess with intent to distribute and conspiracy to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(B). Under his written plea agreement, Hill waived both his direct-appeal and collateral-attack rights. Specifically, he agreed to "waive[] the right to collaterally attack the conviction and sentence pursuant to 28 U.S.C. § 2255, except for claims based on ineffective assistance of counsel which challenge the validity of the guilty plea or this waiver[.]" *United States v. Hill*, No. 4:10-CR-00165-GKF, Doc. No. 31, at 3.[2] For this waiver paragraph, the government took the precaution of having Hill sign directly below the waiver paragraph, attesting this statement: "The defendant expressly acknowledges that counsel has explained his appellate and post-conviction rights; that defendant understands his rights; and that defendant knowingly and voluntarily waives those rights as set forth above." *Id.*

After signing and dating the plea agreement, Hill signed another acknowledgment at the end of his plea agreement:

> I have read this agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully understand my rights with respect to sentencing which may apply to my case. No other promises or inducements have been made to me, other than those contained in this pleading. In addition, no one has threatened or forced me in any way to enter into this agreement. Finally, I am satisfied with the representation of my attorney in this matter.

---

[2] We take judicial notice of materials from the district court's habeas record and the record on appeal from Hill's direct-appeal case. *See Anderson v. Cramlet*, 789 F.2d 840, 845 (10th Cir. 1986) ("Judicial notice is particularly applicable to the court's own records of prior litigation closely related to the case before it.").

6

*Id.* at 15. Moreover, in the plea agreement the government also had Hill's attorney sign his own acknowledgment, stating as follows:

> I am counsel for the defendant in this case. I have fully explained to the defendant the defendant's rights with respect to the pending Indictment. Further, I have reviewed the provisions of the <u>Sentencing Guidelines and Policy Statements</u> and I have fully explained to the defendant the provisions of those Guidelines which may apply in this case. I have carefully reviewed every part of this plea agreement with the defendant. To my knowledge, the defendant's decision to enter into this agreement is an informed and voluntary one.

*Id.* at 16.

In addition, at Hill's change-of-plea hearing, the district court thoroughly reviewed the plea agreement with Hill before hearing his factual basis and accepting his guilty plea. Hill also told the court that he had discussed the Indictment with Scharg and was fully satisfied with his attorney's representation and advice. Hill further told the court that he had read and discussed the plea agreement with Scharg before signing it and that the agreement represented in its entirety his understandings with the government. Hill added that he understood the plea agreement's terms and that no one had made any promises different from those stated in the plea agreement to gain his guilty plea. In evaluating Hill's ability to understand the proceedings, the court accepted Hill's statement that he was a student needing just 37 credits to graduate from Wayne State University.

After reviewing the plea agreement's terms with Hill, the court then directed Hill's attention to possible punishments. The district court explained to Hill—and verified from Hill that he understood—that the court could sentence him anywhere

7

between 5 and 40 years. The court told Hill that it could not determine his sentence until reviewing the presentence report (PSR) and after hearing his and the government's objections to the PSR. The court advised Hill that its sentence may differ from any estimate his attorney may have given him, and that it could impose any reasonable sentence not greater than the statutory maximum or less than the statutory minimum. Hill acknowledged both of these facts. Hill also agreed that he understood that the court could impose the same punishment whether he pleaded guilty or instead was convicted by a jury.

Next, the district court reviewed with Hill the plea agreement's waiver provisions. The court reviewed each subparagraph of the waiver provision so that it could "satisfy [it]self that you understand what exactly you're giving up in regard to these rights." *Hill*, No. 4:10-CR-00165-GKF, Doc. No. 38, at 9. Hill acknowledged that he and his retained counsel had discussed the waiver of appellate and post-conviction rights. After doing so, the district court again assured itself that Hill understood he was giving up his collateral-attack rights.

Next, the district court invited the government to present the facts it would have proved at trial. The prosecutor began with a June 2009 traffic stop in Oklahoma where police seized 565 pounds of marijuana headed for Michigan from Arizona. Those arrested [the Thomases] cooperated with law enforcement, and said they had made five trips to Phoenix for Hill. Typically, Hill would purchase airline tickets for them and him from Michigan to Las Vegas or Phoenix and then provide funds on their debit cards to Detroit, where Hill would meet them. Hill then would distribute

8

the marijuana to others for money. The government was ready to corroborate this with airline, hotel, and rental-car records. Finally, the prosecutor said that the government was prepared to prove and rely on an Oklahoma highway-patrol stop where law enforcement seized $198,000 of marijuana-buy money that was heading from Detroit to Phoenix to buy marijuana. This was representative of several other money shipments to buy marijuana for sale in Detroit.

Taking Hill's guilty plea immediately after the prosecutor's summary of its evidence, the court again assured itself by questioning Hill that his "guilty plea and the waivers of [his] rights [were] made voluntarily and completely of [his] own free choice, free of any force or threats or pressures from anyone." *Hill*, No. 4:10-CR-00165-GKF, Doc. No. 38, at 20. Hill also stated that he was not "relying on any representations or promises which are not clearly and specifically set forth in the written plea agreement." *Id.*

## C. Hill's Pre-Sentencing Events

On May 31, 2011, the probation office approved Hill's Revised PSR. Its sentencing recommendations were straightforward. Because Hill's offense had involved more than 400 kilograms of marijuana (543.55 kilograms), his base offense level was 28. In addition, the probation office recommended a 4-level increase for Hill's role in the offense, specifically finding that he was an organizer or leader of criminal activity involving five or more participants.[3] In addition, the probation

---

[3] As participants, the government identified people Hill paid to transport marijuana and cash between Arizona and Michigan, namely, the Thomases, Aaron

9

office recommended against any reduction for acceptance of responsibility, noting that Hill continued after detention to use mail and telephones to "advise co-conspirators on hiding and concealing assets and drug proceeds, and also gave directives on carrying out transactions with other co-conspirators." *United States v. Hill*, No. 12-5192, R. vol. IV at 105. Using information learned from Hill's recorded jail calls, agents obtained a search warrant for his girlfriend's house and a storage unit, where they seized incriminating letters, drug notations, and cash. *Id.* After the search, Hill called his girlfriend to tell her not to keep letters and to delete two phone numbers from his cell phone. In addition, the PSR calculated Hill's criminal history category as II based on earlier convictions for larceny and fleeing police. The revised PSR recommended a Guidelines range of 135–168 months' imprisonment.

On June 3, 2011, five days before his scheduled sentencing, Hill filed a pro se letter with the court. Having seen the PSR's recommendations, Hill for the first time complained about Scharg. Directly contrary to his representations to the court at his change-of-plea sentencing, Hill now claimed that Scharg and the prosecutors had promised him a sentence of between 57 and 71 months. He also claimed that he had not fully understood his post-sentencing waivers, because Scharg had not explained

Cook (who together with Hill's grandmother was stopped by the Oklahoma Highway Patrol in a van rented by Hill's mother with $198,000 Hill had put in a TV set for marijuana purchase). In addition, Hill paid Joshua Wheeler to store drug proceeds and to transport money to Phoenix at Hill's direction. In addition, Hill paid Yusuf Rashid to distribute marijuana and cocaine for him. Finally, Hill used his girlfriend, Deja Howard, to try to gather his money while he was detained pending trial. Hill also used Samuel Clay, his brother, to help collect money while Hill was detained.

10

them to him. Again contrary to his earlier statements to the court, Hill claimed that he had been tricked into signing his plea agreement because he had insufficient time to review it.

The district court construed this letter as a motion for new counsel and as a motion to withdraw his guilty plea. In evaluating whether Hill's letter merited relief, the court looked to the seven factors set out in *United States v. Garcia*, 577 F.3d 1271, 1273–74 (10th Cir. 2009), and, after applying them, enforced the plea agreement. In doing so, the district court referred to and relied on several of Hill's statements at his change-of-plea hearing that were directly contrary to his letter's claims.

On June 1, 2012, the probation office issued an Addendum to the PSR, addressing both parties' objections. The government stated two objections. First, it argued that the probation office had erred by not adding two offense levels under U.S.S.G. § 3C1.1 for Hill's obstruction of justice. It relied on evidence from Hill's detention hearings about his involvement in the shootings against the Thomases and Wheeler's father in Detroit. It referenced Hill's supposed statement on February 8, 2011, that he wanted a trial because "there would not be any witnesses left to testify at trial." R. vol. II at 36. The government also relied on several recorded jail calls between Hill and his girlfriend directing her to collect and hide drug proceeds, remove evidence, and conceal assets and cash. Even so, the probation office still refused to impose the obstruction-of-justice enhancement, contending that Hill's activity "must have materially hindered the official investigation or prosecution of

11

the instant offense or sentencing of the defendant." *Hill*, No. 12-5192, R. vol. IV at 115. Second, the government argued that Hill was ineligible for an acceptance-of-responsibility reduction. The probation officer noted that the Revised PSR no longer awarded Hill that reduction.

Hill objected on multiple grounds: first, to the government's use of Hill's information provided in Rule 11 proffers; second, to the weight of the marijuana the PSR attributed to his involvement in the offense; third, to the role-in-the-offense enhancement under U.S.S.G. § 3B1.1; and, fourth, to the failure in the Revised PSR to award him any levels for acceptance of responsibility under § 3E1.1. The probation office rejected each objection.

## D. Hill's Sentencing Hearings

On June 8, 2012, the district court held what turned out to be a first sentencing hearing. By this time, Julia O'Connell had replaced Scharg as Hill's counsel. The government first called Yusuf Rashid to testify. Rashid admitted two previous felony convictions for possessing marijuana with intent to deliver, one in 2003 and the other in 2010. Rashid testified that he had known Hill for about three years, first as one of his marijuana buyers and later as his marijuana supplier. He said that he had begun buying 20-pound bales of marijuana from Hill and increased to buying as much as 80-pound bales, paying $925 to $975 a pound. He estimated about 20 to 25 total buys from Hill. He also testified to buying from Hill about 3 or 4 kilograms of cocaine.

Rashid recalled a time when Hill visited his home and visited with him in the basement for privacy.[4] During this visit, Hill told him that he was looking for someone to "take care of this fat guy and his—and a girl down in—it was down in Ecorse." *Hill*, No. 12-5192, R. vol. II at 33–34. After Rashid said he didn't know anyone to do that, Hill took him to a store and bought him a cell phone to call him if he found someone or needed to talk about buying drugs. Rashid understood that Hill wanted the fat man and girl murdered before Christmas because "the guy was supposed to go in protective custody." *Id.* at 35. He described Hill as calm and serious. He said that Hill mentioned a $5,000 price for the murder of the fat guy.

The government next called DEA Agent Jillian Fitch to testify. She testified that she interviewed Hill in 2010. She recalled that on January 4, 2011, she received a call from Agent Cory Hallum, telling her about the shooting at the Thomas house in Ecorse, Michigan. She referenced the 19 rounds fired into the Thomases' master bedroom. She said that on January 5, 2011, Agent Hallum met with Mr. Thomas and that Mr. Thomas was shot to death later that day when he and his wife and her mother returned to the house to collect belongings before being relocated. Men with assault rifles ambushed the three, killing Mr. Thomas and also shooting and injuring Mrs. Thomas's mother.

The government then directed Agent Fitch's attention to Hill's recorded jail calls. Agent Fitch testified about Hill's call to his girlfriend on February 8, 2011, the day

---

[4] At the second phase of the sentencing hearing, the government clarified that this meeting had occurred in December 2010.

he was detained. During that call, he directed his girlfriend to take a phone to "Fat Boy" and to take the "275" and "297" to a "safety security box" or to where they had previously been kept. Based on her experience and training, Agent Fitch testified that "275" likely referred to $275,000. Based on the jail calls, DEA agents in Detroit were able to surveil Hill's girlfriend and her mother—sometimes in real time—as they drove to different locations in accordance with Hill's directions.

Using the information from Hill's recorded jail calls and other information gained in the investigation, Agent Fitch obtained two search warrants for residences. She testified that agents seized certain letters from Hill at both locations. In addition, agents seized $25,000 in currency, a small amount of marijuana, and a folder with notes and ledgers. One document agents seized was Hill's February 17, 2011 letter to his girlfriend directing her to see Fat Boy and get "440" (referring to $440,000) and go straight home. In the letter, he told her to find a place where robbers or the police wouldn't find the "440." In another letter, Hill directed his girlfriend to wrap it like he used to after she got it from Fat Boy and to have her mother put it in four different banks, inside safety deposit boxes. He told her to keep "30" from the "380" and to use a shrink-wrap machine to wrap and divide it. Hill directed her to see Fat Boy in person because he believed that agents tapped her phone. Agent Fitch also testified about Hill's recorded jail call on March 9, 2011[5] to his girlfriend in which he expressed anger that she had kept letters from him that the police were able to

___

[5] This jail call occurred after Hill had pleaded guilty, violating the plea agreement's condition on acceptance-of-responsibility levels, namely, that he continue to manifest acceptance of responsibility as determined by the United States.

14

find and take. He later told her to read a letter and then burn it. Again from jail, Hill later instructed his girlfriend to retrieve a telephone from a coat pocket and erase two numbers from it. During cross-examination of Agent Fitch, Ms. O'Connell asked the court for a moment, it appearing that she might be suffering a serious medical problem. After she had left to seek treatment, the government advised that its case agent was going to Afghanistan for three weeks and asked for a setting on August 2, 2012, to continue the sentencing. The court tentatively set sentencing to continue on that date.

On August 2, 2012, the court held the second part of the sentencing hearing. After Ms. O'Connell finished cross-examining Agent Fitch, the government called DEA Agent Cory Hallum. Agent Hallum testified that he was the primary case agent on Hill's case since 2009. He reviewed in detail Hill's role in the conspiracy and roles he assigned others before and during his detention.

Because Hill chose not to call any witnesses, the court then turned to the parties' objections to the PSR. Ms. O'Connell waived Hill's argument about drug weight, agreeing that her argument about the conversion of cash amount to marijuana amounts would not affect the base offense level. She described her earlier objection about the government's use of proffer information as "neither here nor there." She continued to object to the role-in-offense enhancement and the failure to provide a reduction for acceptance of responsibility. Addressing the acceptance-of-responsibility argument first, Ms. O'Connell argued that "[o]nce he accepted that plea agreement, he did what was required of it and he continued from that moment

15

forward to manifest acceptance of responsibility." *Hill*, No. 12-5192, R. vol. III at 67. Moving to the role-in-offense enhancement, she argued that Hill was not a leader or organizer, but instead one with "a reduced management or supervisory role in the offense." *Id.* For this reason, she argued that "the more appropriate role in the offense would be found in [§] 3B1.1(b)." *Id.* at 68. Had Hill prevailed in that regard, he would have received a three-level enhancement instead of the PSR's recommended four levels.

The district court rejected both of Hill's objections. First, for the role-in-offense objection, the court concluded that Hill was a leader or organizer of criminal activity involving 5 or more participants. It noted his role in providing others with cash, automobiles, accommodations, and drop-off points for cars, money, and drugs. The court found that after delivering the marijuana to his buyers, Hill would pay a smaller portion of the proceeds to the other participants. Second, for the acceptance-of-responsibility objection, the court noted that *after* Hill pleaded guilty on March 7, 2011, he called his girlfriend from jail and told her to read and burn particular letters from him and to delete two phone numbers for a cell phone inside his coat pocket.

Next, the court addressed the government's objection that the PSR had not included an enhancement for obstruction of justice under U.S.S.G. § 3C1.1. The court agreed with the government, relying in part upon its finding by a preponderance of the evidence from Yusuf Rashid's testimony that Hill offered to pay $5,000 to murder a man who was about to enter protective custody. Despite this finding, the court sentenced Hill at the low end of his resulting advisory range of

16

168 to 210 months of imprisonment (rejecting the government's recommendation for the high end). The court did so after Hill apologized to the court for committing the charged offense. During his remarks, Hill said to his counsel, Ms. O'Connell, "You did a great job today." *Hill*, No. 12-5192, R. vol. III at 76. Nowhere in his remarks to the court did Hill claim his present or past counsel had deceived him or otherwise poorly performed. Nor did Hill protest his 168-month sentence as beyond what his former counsel, Mr. Scharg, and the government had promised him before he pleaded guilty.

### E. Hill's Direct Appeal

Notwithstanding his appeal waiver, Hill appealed "his sentence," seeking consideration and relief on grounds that the government had breached his plea agreement. *United States v. Hill*, 568 F. App'x 549, 552 (10th Cir. 2014) (unpublished). Reviewing for plain error, this court agreed with Hill and found that the government had breached its plea agreement in one respect. The *Hill* court focused on paragraph 11 of the plea agreement, particularly on one sentence reading, "The obligations of the Government herein, relative to acceptance of responsibility are contingent upon the defendant's *continuing* manifestation of acceptance of responsibility as determined by the United States." *Id*. at 553 (emphasis in original). Because the government had referenced and in part relied upon *pre-plea* conduct of Hill's to support the obstruction-of-justice enhancement under § 3C1.1, we concluded that it had run afoul of its agreement to deny an acceptance-of-responsibility reduction only for *post-plea* obstruction of justice (the *Hill* court's

17

treating "continuing" as reaching obstructive conduct occurring only *after* Hill's guilty plea on March 7, 2011).[6] *Id.* Even so, the court denied Hill any relief, concluding that he could not meet the third prong of the plain-error analysis—that is, he could not show that the error affected his substantial rights. *Id.* at 553–54. He failed because the government had also presented post-plea obstructive conduct that equally justified the obstruction-of-justice enhancement under U.S.S.G. § 3C1.1. We affirmed Hill's 168-month sentence.

## F. Hill's Habeas Petition in District Court

On September 22, 2014, Hill filed in the district court an amended motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. In support of his motion, his accompanying memorandum alleged three grounds supporting his petition:

Ground one: Ineffective Assistance of Trial Counsel

Trial counsel was ineffective when, prior to the plea negotiation, counsel secretly provided the government with fabricated incriminating information against the Defendant causing the Defendant to involuntarily waive his right to collaterally attack his sentence.

Ground two: Ineffective Assistance of Sentencing Counsel

---

[6] The government's problem was its plea-agreement wording, not anything in the sentencing guideline. Under the guideline, a defendant obstructing justice is generally ineligible for acceptance-of-responsibility levels whether the obstructive conduct comes before or after entry of a guilty plea: "Conduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply." U.S.S.G. § 3E1.1, n.4.

18

Sentencing counsel was ineffective when failing to inform the Defendant he could testify at sentencing in his own defense against allegations of criminal conduct.

Ground three: Ineffective Assistance of Counsel

Whether counsel was ineffective for failing to request that the court make a finding of breach of the plea agreement by the Petitioner or the Government before allowing the Government to alter its sentencing recommendation.

R. vol. I at 136. In evaluating these claims, the district court directed its attention to

Hill's waiver of his right to seek habeas relief under § 2255:

In consideration of the promises and concessions made by the United States in this plea agreement, the defendant knowingly and voluntarily agrees to the following terms:

* * *

d. The defendant waives the right to collaterally attack the conviction and sentence pursuant to 28 U.S.C. § 2255, except for claims based on ineffective assistance of counsel which challenge the validity of the guilty plea or this waiver[.]

R. vol. I at 230.

Next, the district court examined Hill's habeas claims against this waiver language to determine what claims, if any, survived Hill's agreed waiver. It found one survivor, concluding that Hill's first claim alleging ineffective assistance of counsel *during* plea negotiations challenged the validity of the plea agreement and thus escaped the plea agreement's waiver. *See United States v. Cockerham*, 237 F.3d 1179, 1184 (10th Cir. 2001) (excluding from an appellate waiver ineffective-assistance-of-counsel claims "not relating to the validity of the plea, i.e., the negotiation or entering of the plea and waiver"). But the district court determined

19

that Hill's other claims—based on alleged ineffective assistance of counsel at sentencing—did not challenge the validity of the plea agreement's waiver. In seeking a COA from this court, Hill focuses solely on his first ground and does not raise here the second and third grounds he made in district court.

In district court, Hill alleged that during plea negotiations his counsel, Scharg, ineffectively assisted him by guaranteeing him a sentence between 57 and 71 months, all while knowing Hill's sentence would be higher because of "fabricated evidence" Scharg had earlier supplied the government. Hill claimed that this evidence led to his receiving an obstruction-of-justice enhancement under U.S.S.G. § 3C1.1, which in turn defeated his reduction for acceptance of responsibility under § 3E1.1. Had he known of his counsel's misdeeds, Hill says, he never would have pleaded guilty or waived his right to pursue relief under 28 U.S.C. § 2255.

In addressing Hill's claim, the court began by reciting the familiar two-pronged test for ineffective-assistance-of-counsel claims set out in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Specifically, the court noted that Hill needed to establish "both that his attorney's representation was deficient and that he was prejudiced by that deficiency." R. vol. I at 246 (quoting *James v. Gibson*, 211 F.3d 543, 555 (10th Cir. 2000)). The district court further noted that "[t]here is a strong presumption that counsel provided effective assistance, and a section 2255 defendant has the burden of proof to overcome that presumption." *Id.* at 246–47 (quoting *United States v. Kennedy*, 225 F.3d 1187, 1197 (10th Cir. 2000)).

20

Next, the district court examined Hill's contentions. It noted that Hill claimed that his counsel had written on the bottom of his guilty-plea petition a guaranteed offense level of 25, together with a guideline range of 57 to 71 months. The court acknowledged that these numbers are in fact written on the bottom of the first page of that petition. The court recounted that "Hill insists that he 'would not have entered into the waiver' if he had known his counsel's alleged representations were false." R. vol. I at 247 (quoting R. vol. I at 147).

But the district court still rejected this claim on the merits, emphasizing Hill's statements at the change-of-plea hearing. Among other things, Hill verified there that he had received a copy of his indictment; had discussed the charges with his attorney; had read and discussed the plea agreement with his attorney; and understood the terms of the plea agreement, including its appellate-waiver provisions, which prevented collateral attacks on his conviction under 28 U.S.C. § 2255 except for ineffective-assistance-of-counsel claims challenging the validity of his plea or waiver. The court again also relied upon Hill's specifically signed waiver of any collateral attacks under § 2255 under the plea agreement.

## DISCUSSION

Before Hill can appeal the district court's decision, he must obtain from this court a COA. 28 U.S.C. § 2253(c)(1)(A). We may issue a COA only if a petitioner makes a "substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). This standard requires a "showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a

21

different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted). Where a district court rejects the petitioner's constitutional claims on the merits, the "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the [petitioner's] constitutional claims debatable or wrong" to obtain a COA. *Id.* Here, we conclude that reasonable jurists would not debate whether the district court properly denied Hill's ineffective-assistance-of-counsel argument.

Hill argues throughout his COA motion that Mr. Scharg provided false information against Hill to the government and the court, causing the district court to increase Hill's sentence for an obstruction-of-justice enhancement under U.S.S.G. § 3C1.1. As we understand it, Hill builds this claim upon two sources. First, as noted above, at the failed change-of-plea hearing on February 8, 2011, Mr. Scharg responded to the district court's question about whether Hill's unexpected decision not to proceed with his guilty plea resulted from fear about his having earlier cooperated with law enforcement. Mr. Scharg advised, "Your Honor, I think his position is he thinks that the government doesn't have enough witnesses to proceed against him in trial at this point." R. vol. III at 8. Second, Hill relies on a statement in the government's objection to the original PSR. There, the government represented that among other evidence heard at Hill's detention hearing immediately after the failed change-of-plea hearing, "[e]vidence was also presented that established the defendant stated on February 8, 2011, the day he was scheduled to

22

enter a plea of guilty, that he wanted a 'trial' because 'there would not be any witnesses left to testify at trial.'" R. vol. II at 36. From this, it appears that the government in its objection exaggerated what Mr. Scharg had actually told the district court.

Hill presents his argument as if Mr. Scharg's statement was the sole basis on which the magistrate judge detained him, and on which the district court later imposed the obstruction-of-justice enhancement. Among other things, he ignores the preceding language in the government's objection to the PSR:

> During that hearing [the February 8, 2011 detention hearing], the Government presented evidence relating to the January 5, 2011, murder of Corry Thomas, a Government witness in the investigation and prosecution of the defendant. During the detention hearing, evidence was presented that the defendant offered $5,000 for the murder of Corry Thomas. Evidence was also presented relating to the January 11, 2011 shooting and attempted assassination attempt of another Government witness, Joshua Wheeler. During that shooting, his father-in-law was shot multiple times, however, he survived. Further, there was evidence presented that because of these shooting incidents, the Government was forced to relocate several other Government witnesses and their families.

R. vol. II at 35–36. This summary makes apparent that the government was fully aware of the scope of violence against witnesses in Hill's case long before Scharg responded to the district court's question about why Hill no longer wished to plead.

In addition, the district court did not impose obstruction-of-justice levels based on any statement Scharg uttered. Instead, the district court looked elsewhere. At the sentencing hearing, the district court heard directly from Yusuf Rashid about Hill's efforts to find someone to kill Mr. Thomas. The district court applied the obstruction-of-justice enhancement after finding Rashid sufficiently credible to

23

support a preponderance finding that Rashid's account "ought to be believed." *Hill*, No. 12-5192, R. vol. III at 76. Because the obstruction issue was a difficult one, the court "want[ed] to make it very clear as to the basis for the obstruction ruling. . . ." *Id.* Simply put, Hill received obstruction-of-justice levels based on his own conduct, not based on any of Scharg's statements.

In addition, Hill bases his Sixth Amendment ineffective-assistance-of-counsel argument upon the government's and Scharg's supposedly securing his guilty plea by deceiving him into believing that he was guaranteed a sentence between 57 and 71 months of imprisonment. As support, he offers a meager hand-written notation at the bottom of the first page of his petition to plead guilty. Although that notation implicitly describes an offense level of 28 minus 3 levels for acceptance of responsibility, which if combined with an unstated criminal history category I, would yield an advisory sentencing range of 57 to 71 months, nothing shows any sort of guarantee. And rightly so. Indeed, at sentencing Hill conceded that his base offense level alone was 28 (instead of 26 as he first contended in objecting to the original PSR), argued for three additional levels (rather than four) for his role in the offense under § 3B1.1, and did not oppose the PSR's assigned criminal history category of II.

Nor was Hill free to harbor some supposedly secret deal between him, his counsel, and the government for a sentence far below the likely advisory range. As stated in the district court's thorough review, Hill had both in writing and in person at his change-of-plea hearing repeatedly told the district court that he had been

24

promised nothing outside of the plea agreement and that he fully understood that he could be sentenced for up to 40 years of imprisonment. Hill repeatedly acknowledged accepting the plea agreement's terms knowingly and voluntarily, and he cannot now casually brush aside his many representations to the district court. *See Cockerham*, 237 F.3d at 1188–89 (holding that defendant "entered the plea and made the waiver knowingly and voluntarily" in view of defendant's statements in the plea agreement and during the plea colloquy about his understanding the plea agreement's terms).

Finally, in vague terms, Hill contends that his Sixth Amendment rights were violated because his retained counsel, Scharg, labored under a conflict of interest during his representation. As we understand it, Hill argues that by informing the district court why Hill no longer wished to plead guilty on February 8, 2011, Scharg succumbed to or manifested "divided loyalties" that prevented his providing Hill effective assistance of counsel. From our review of the record, we see that Mr. Scharg represented Hill's interest at every step of the proceedings until leaving the case. Accordingly, we see no merit to Hill's conflict-of-interest claim.

**CONCLUSION**

We deny Hill's request for a COA and dismiss this appeal.

Entered for the Court

Gregory A. Phillips
Circuit Judge